UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

CARMEN BRITT and CARMEN BRITT,
as Executor of the Estate of Lula Baity,

           Plaintiff,

v.                                         **DECISION AND ORDER**
                                                06-CV-057S

BUFFALO MUNICIPAL HOUSING AUTHORITY,
ELAINE GARBE,
JERI GIWA,
GRACE MANOR HEALTH CARE FACILITY, INC.,
DAVID J. GENTNER,
MARY STEPHAN,
KATHY RANDALL,
TIFFANY MATTHEWS,
NELDA LAWLER, M.D.,
TERESA CHAU, M.D.,
THE COUNTY OF ERIE,
ERIE COUNTY MEDICAL CENTER,
JESUS A LIGOTT, M.D.,
PHILLIP J. RADOS, M.D.,
JESSICA W. BLUME, M.D.,

           Defendants.[1]

# I. INTRODUCTION

Plaintiff Carmen Britt brings this action in her individual capacity and on behalf of

---

[1] The following is a brief description of the defendants named in this lawsuit:
Elaine Garbe – Supervisor for the Buffalo Municipal Housing Authority ("Housing Authority")
Jeri Giwa – Case Manager at the Housing Authority
David Gentner – President and CEO of Grace Manor Health Care Facility, Inc. ("Grace Manor")
Mary Stephan – Nurse and Facility Representative for Grace Manor
Kathy Randall – Director of Social Work for Grace Manor
Tiffany Matthews – Social Worker for Grace Manor
Dr. Nelda Lawler – Physician at Grace Manor
Dr. Teresa Chau – Physician at Grace Manor
Dr. Jesus Ligot – Physician/Resident at Erie County Medical Center ("ECMC")
Dr. Phillip Rados – Physician at ECMC
Dr. Jessica Blume – Physician/Resident at ECMC

1

the estate of her aunt, Lula Baity. Britt brings her claims under 42 U.S.C. § 1983 claiming that several defendants violated Baity's First, Fourth, and Fourteenth Amendment rights when, allegedly against her will, Baity was removed from her home and admitted to Erie County Medical Center ("ECMC") and later referred and admitted to Grace Manor Health Care Facility, Inc. ("Grace Manor"). Britt also alleges that Grace Manor retaliated against her in violation of her constitutional rights. Finally, Britt brings an intentional infliction of emotional distress claim on behalf of herself and her aunt.

Presently before this Court are summary judgment motions filed by each party, including: (1) Dr. Phillip Rados (Docket No. 301); (2) Grace Manor, David Gentner, Tiffany Matthews, Kathy Randall, and Mary Stephan (Docket No. 304); (3) Buffalo Municipal Housing Authority ("Housing Authority") and Elaine Garbe (Docket No. 305); (4) Dr. Teresa Chau and Nelda Lawler (Docket No. 306); (5) ECMC, Erie County, Dr. Jessica Blume, and Dr. Jesus Ligott (Docket No. 307); (6) Carmen Britt (Docket No. 308.) For the following reasons, each Defendants' motion is granted and Britt's motion is denied.

## II. BACKGROUND

**A.    Facts**

On September 30, 2003, Jeri Giwa, a Housing Authority employee who is now deceased, visited Baity's residence at the Housing Authority's Commodore-Perry Apartments.[2] (Plaintiff's Statement of Facts (Pl.'s Statement"), ¶ 5; Docket No. 308;

---

[2] The Housing Authority manages public housing developments throughout the City of Buffalo for lower income families and individuals. CITY OF BUFFALO, http://www.ci.buffalo.ny.us/Home/CityServices/Buffalo_Municipal_Housing_Authority/ApplicationInformation (last visited Oct. 14, 2011).

Defendants' Joint Statement of Facts ("Defs' Statement"), p. 2; Docket No. 301-3.)[3] Once inside Baity's apartment, Giwa apparently became concerned with what she observed. Giwa described the apartment as "cluttered" and thought Baity was confused, suffering from delusions about her deceased husband, and generally unable to care for herself. (Defs.' Statement, p. 2.) Subsequently, Giwa, representing that she was Baity's social worker (she was not), called the Crisis Services of Erie County Outreach Team, to report a problem with Baity.[4] (Pl.'s Statement, ¶ 5.) The next day, Jill Stadelmeyer, a Crisis Services employee and non-party to this action, arrived at Baity's home and determined that Baity should be taken to ECMC pursuant to New York Mental Hygiene Law ("NYMHL") § 9.45, which allows for such an action under certain circumstances. (Id., ¶ 2 (III)-(IV).)

Rural Metro ambulance personnel eventually arrived at Baity's residence, escorted her to the ambulance, and transported her to ECMC. (Id., ¶ 8.) In the course of these events, Britt claims that Giwa "physically seized Ms. Baity's person by grabbing hold of her arm in an effort to force her from the apartment." (Id.)

Upon admission to ECMC, Baity underwent a physical examination where the admitting personnel determined that she was anemic, dehydrated, hypertensive, and

---

[3] This Court has accepted facts included in Defendants' and Plaintiff's Statement of Facts to the extent that they have not controverted each other's statements. See Local Rule 56(a)(2) (statements of material fact that are not specifically controverted by the non-moving party are deemed admitted). Although Plaintiff's statement is riddled with improper argument, this Court has accepted it for the facts it does contain. Defendants have collectively filed a joint statement of undisputed facts.

[4] The Crisis Services Emergency Outreach Program receives referrals from other community mental health agencies, family members, police, friends, neighbors, landlords, or anybody else concerned about the welfare of an individual who appears to be in a mental health crisis. Its staff is responsible for assessing whether an individual meets the criteria under Section 9.45 of the New York State Mental Hygiene Law. CRISIS SERVICES EMERGENCY OUTREACH, http://crisisservices.org/content/index.php/suicide-prevention/ (last visited Oct. 14, 2011)

suffering from an irregular heartbeat. (Defs.' Statement, p. 4.) The emergency room attending physician, a non-party to this action, prescribed blood pressure medication and recommended inpatient admission to the "Medicine C Service" floor, a medical wing at ECMC. (Id.) Two different physicians, also non-parties, saw her later that night and prescribed aspirin and a diuretic. When Defendant Dr. Rados first evaluated her the next day, he continued those medications and ordered tests, including a CT scan and a neuropsychiatric evaluation.[5] (Id., p. 5.) She stayed at ECMC for several days, during which time her hypertension and irregular heartbeat improved. (Id., p. 6.)

On October 8, while still at ECMC, Baity was seen by Dr. Ralph Benedict, M.D., also a non-party, who performed the neuropsychological evaluation ordered earlier by Dr. Rados. (Id., p. 6.) Dr. Benedict concluded that Baity was suffering from dementia and lacked the capacity to live independently. He recommended that Baity be discharged to a supervised environment. (Id.)

This recommendation prompted Baity's move to Grace Manor, a nearby nursing home. This decision appears to have been the subject of a dispute within the Britt family. Carmen Britt claims that she and Baity "protested and objected to Ms. Baity's involuntary confinement at Grace Manor." (Pl.'s Statement, ¶ 35.) However, Cindy Paluh, a discharge planner for ECMC, discussed Baity's move with Baity's brother, J.D. Britt, and sister-in-law, Mattie Britt (Carmen Britt's uncle and aunt). (Defs.' Statment, p. 6.) They all agreed that Baity should be discharged to Grace Manor. Defendants also assert that Baity never

---

[5] Defendants Jesus Ligot, M.D. and Jessica Blume, M.D., State University of New York at Buffalo Medical School residents on rotation on the "Medicine C" floor, also evaluated Baity. (Defs.' Statement, p. 5.)

objected to her treatment at ECMC or her discharge to Grace Manor. (Id., p. 7.)

It is undisputed that Baity never signed a consent form for her admission to Grace Manor. (Pl.'s Statement, ¶ 45.) Defendants, however, claim that Baity could not make this choice on her own due to her condition, that her brother and sister-in-law consented to the move on her behalf, and that Carmen Britt missed appointments and failed to return calls regarding review of the form. (Defs.' Statement, p. 9.)

In any event, on October 10, 2003, Baity was moved to Grace Manor and was assigned to the third floor dementia unit per Dr. Benedict's diagnosis. (Id., p. 7.) Nelda Lawler, M.D. was the floor's staff physician. She evaluated Baity and prescribed several medications, including the anti-psychotic Risperdal®.[6] Britt claims that any treatment Baity received at Grace Manor was against her will.

As part of that treatment, New York State law requires that patients in long-term care facilities receive periodic dental treatment. On October 24, 2003, professionals for McClure Dental Services, who provide dental services to individuals at Grace Manor, examined Baity and recommended the extraction of three teeth. (Id., pp. 8-9.) Dr. Priclla Adams, D.D.S. of McClure Dental performed the procedure two weeks later.[7] (Id., p. 9.) Britt claims that Baity never consented to such a procedure and that Dr. Lawler unlawfully signed the consent form in place of Baity. (Pl.'s Statement, ¶ 51.)

Britt, believing her aunt's stay at Grace Manor was improper and illegal, commenced state habeas corpus proceedings against Grace Manor in an effort to secure Baity's

---

[6] Britt also asserts Baity was subject to "daily enemas and suppositories" (Pl.'s Statement, ¶ 48) but her citation to the record reveals no such fact.

[7] Neither McClure Dental, nor any individuals associated with McClure Dental, are defendants in this action.

5

release. Grace Manor claims to have never received any complaints from Britt before learning of the habeas corpus action. (Defs.' Statement, p. 9.) However, after appearing in state court on December 23, 2003, the parties held a meeting to discuss Baity's status. (Id.) They agreed that Baity could go home if she was provided twenty-four hour care. (Id.) After several scheduling problems, Baity was finally discharged on January 10, 2004. (Id., p. 10.)

According to Defendants, following her discharge, Grace Manor learned that Baity was alone for at least two consecutive days. (Id.) With this information, Grace Manor called Adult Protective Services to report what they considered to be a dangerous situation. (Id., p. 11.) Britt alleges that, in fact, Grace Manor made numerous calls, some of which were directed at herself and Baity. Considering the calls unjustified and harassing, she ultimately petitioned for and received a state-court injunction prohibiting any Grace Manor employee from contacting Baity or herself. ("Final Order"; Docket No. 312-11, Exhibit Y.)

While these events were unfolding, the Housing Authority was also pursuing an eviction proceeding against Baity because she had underpaid her rent. (Pl.'s Statement, ¶ 61.) Some time in late August or early September 2003, Baity had mistakenly paid only $100.88 for her regular monthly rent payment of $188.00.[8] (Id., ¶ 3.) However, the proceeding was eventually halted and the matter settled.

## B.  Procedural History

Britt commenced this action in New York State Supreme Court, County of Erie on December 28, 2005 (Docket No. 1.) Defendants removed to this Court on January 26,

---

[8]Baity had trouble understanding this discrepancy and several attempts to resolve the matter proved unsuccessful. (See Garbe Deposition, pp.18-19.)

2006 (Docket No. 1.) Britt moved for leave to amend her complaint on October 17, 2006, which this Court granted in part and denied in part. (Docket No. 182.) Motions to strike portions of the amended complaint on behalf of all Defendants were filed on November 26, 2007. (Docket Nos. 188-192, 194.) This Court granted in part and denied in part those motions on September 30, 2008. (Docket No. 235.) Pursuant to that order, Britt filed a second amended complaint on November 6, 2008. (Docket No. 239.)

On July 26, 2010, this Court accepted Magistrate Judge Kenneth Schroeder's Report, Recommendation, and Order (Docket No. 268) which, noting Jeri Giwa's death, dismissed Giwa from the lawsuit and denied Britt leave to substitute a party. (Docket No. 286.)

Individually or collectively, each party now moves for summary judgment.

### III. DISCUSSION

**A.     Summary Judgment Standard**

Rule 56 of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A fact is "material" only if it "might affect the outcome of the suit under governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). A "genuine" dispute exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Id. In determining whether a genuine dispute regarding a material fact exists, the evidence and the inferences drawn from the evidence "must be viewed in the

light most favorable to the party opposing the motion." Adickes v. S. H. Kress & Co., 398 U.S. 144, 158–59, 90 S. Ct.1598, 1609, 26 L. Ed. 2d 142 (1970) (internal quotations and citation omitted); see also Fed. R. Civ. P. 56(c).

"Only when reasonable minds could not differ as to the import of evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991) (citation omitted). Indeed, "[i]f, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 82-83 (2d Cir. 2004) (citations omitted). The function of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249.

When the parties cross-move for summary judgment, "the standard is the same as that for individual motions for summary judgment." Natural Res. Def. Council v. Evans, 254 F.Supp.2d 434, 438 (S.D.N.Y. 2003). "The court must consider each motion independently of the other and, when evaluating each, the court must consider the facts in the light most favorable to the non-moving party." Id. (citing Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001)).

**B.   Federal Claims**

Britt brings several claims under 42 U.S.C. § 1983. Civil liability is imposed under § 1983 only upon persons who, acting under color of state law, deprive an individual of rights, privileges, or immunities secured by the Constitution and laws. See 42 U.S.C. § 1983. On its own, § 1983 does not provide a source of substantive rights, but rather a method for vindicating federal rights conferred elsewhere in the federal statutes and

Constitution. See Graham v. Connor, 490 U.S. 386, 393-94,109 S. Ct. 1865, 1870, 104 L. Ed. 2d 443 (1989) (quoting Baker v. McCollan, 443 U.S. 137, 145 n.3, 99 S. Ct. 2689, 2695, 61 L. Ed. 2d 433 (1979)).

Thus, to establish liability under section 1983, the plaintiff must satisfy two essential elements: (1) the defendant acted under color of state law; and (2) as a result of the defendant's actions, the plaintiff suffered a denial of her federal statutory rights, or her constitutional rights or privileges. Annis v. County of Westchester, 136 F.3d 239, 245 (2d Cir. 1998). "§ 1983 excludes from its reach merely private conduct, no matter how discriminatory or wrongful." Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 50, 119 S. Ct. 977, 143 L. Ed. 2d 130 (1999).

### 1.     Grace Manor Defendants[9]

Britt seeks to hold Grace Manor, an admittedly private institution, liable under § 1983. Under some circumstances a private party may be held liable under § 1983, but to do so requires Britt to demonstrate either that: (1) there was a "close nexus" between the private and state actors, (2) the private activity was a product of "state compulsion," or (3) the private activity performed a public function. Turturro v. Cont'l Airlines, 334 F. Supp. 2d 383, 394 (S.D.N.Y. 2004) (citing Okunieff v. Rosenberg, 996 F. Supp. 343, 347-57 (S.D.N.Y.1998), aff'd, 166 F.3d 507 (2d Cir.1999) (per curiam)). Britt argues that the Grace Manor defendants acted under color of state law because they acted in concert with state agents, namely the employees of the Housing Authority and ECMC.

However, the connection that Britt seeks to make is strained and tenuous. Even

---

[9]This group entails both Grace Manor itself and all of its employees.

assuming, *arguendo*, that the Housing Authority defendants wrongfully removed Baity from her home, Britt asserts no facts that connect this decision to the Grace Manor defendants. Instead, the evidence demonstrates that Crisis Services made an independent decision to take Baity to ECMC. Then, the individuals at ECMC, based on medical examinations and evaluations, made their own independent determination that she needed more care than she would receive if she were alone. Thus, with her family's consent, they referred Baity to Grace Manor, a suitable location for Baity's condition. From that point, the Grace Manor defendants were free to treat Baity as they saw fit. Their decisions were plainly without involvement from ECMC or the Housing Authority. See Bolmer v. Oliveira, 570 F. Supp. 2d 301 (D. Conn 2008) (finding no close nexus where a state agency referred plaintiff to a private hospital).

Britt's allegations are "vague and conclusory, and the Second Circuit has held that '[a] merely conclusory allegation that a private entity acted in concert with a state actor does not suffice to state a § 1983 claim against the private entity.'" Turturro, 334 F. Supp. 2d at 398 (quoting Ciambriello v. County of Nassau, 292 F.3d 307, 324 (2d Cir. 2002). For these reasons, the Grace Manor defendants' actions do not meet the close nexus test.

Britt also fails to satisfy either of the other two tests. Possibly in an effort to argue that the Grace Manor defendants were performing a public function, Britt relies on West v. Atkins, 487 U.S. 42, 108 S. Ct. 2250, 101 L. Ed. 2d 40 (1998). This reliance is misplaced. In West, the Court concluded that Samuel Atkins, a private doctor under contract with the state to provide medical services to inmates, could be held liable under § 1983. But under the Eighth Amendment, the state is required to provide adequate medical treatment to those whom it has incarcerated. See id. at 55. The Court in West

10

specifically distinguished the custodial physician-patient relationship from the "ordinary" physician-patient relationship. Id. at 57, n. 15. Because Baity was not an inmate subject to Eighth Amendment protections, this is not a case where the state passed the responsibility of a task, which it had an obligation to perform, onto a private party. Simply put, Grace Manor, a private nursing home, was not performing a public function.

Finally, Britt points to no facts that could establish that the Grace Manor defendants acted under state compulsion. As discussed above, Grace Manor merely accepted a patient who was referred to them by ECMC with the consent of J.D. and Mattie Britt. Its actions were not compelled by the state.

To hold these private actors liable would expand the scope of 1983 liability beyond its intended purpose – to "ensure that state action is the subject of the complaint." See Blum v. Yaretsky, 457 U.S. 991, 102 S. Ct. 2777, 73 L. Ed. 2d 534. Thus, failing to establish that Grace Manor's actions can be attributed to the state, summary judgment is granted with respect to all of Britt's federal claims asserted against the Grace Manor defendants.

## 2. The ECMC Defendants[10]

---

[10] Britt asserts claims against Erie County, ECMC, and ECMC physicians Dr. Rados, Dr. Ligot, and Dr. Blume. However, this Court takes judicial notice that ECMC, pursuant to Article XVI of the Erie County Charter at the time the alleged violations occurred, was an administrative unit of Erie County and not a separate legal entity subject to suit.

The claims against Erie County are proper, but are dismissed. A municipality may be held liable for damages under § 1983 only when execution of *government policy or custom* inflicts the injury in question. Monell v. Dep't of Soc. Servs of City of New York, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (emphasis added). Britt alleges no such policy or custom, nor presents any evidence to that effect. Therefore, summary judgment is warranted.

Dr. Rados, the ECMC treating physician, has moved for summary judgment separately from Drs. Ligot and Blume, the residents under his supervision. Dr. Rados argues that because he is paid by a private company under a separate contract, he should not be considered a state actor under § 1983 even though he works under the auspices of ECMC, a public hospital. However, this Court need not address that question. See Allstate Ins. Co. v. Serio, 261 F.3d 143, 149-50 (2d Cir. 2001) ("It is axiomatic that the

Britt argues that the ECMC defendants violated NYMHL 9.45, and therefore violated Baity's due process rights. This law allows, with certain procedural safeguards, a hospital to involuntarily commit an individual for immediate observation if she poses a threat of serious harm to herself or others. See NYMHL § 9.45 (McKinney 2011). There can be a procedural due process violation if those safeguards are not properly applied. See Fisk v. Letterman, 501 F. Supp 2d. 505, 525 (S.D.N.Y. 2007); see also Project Release v. Prevost, 722 F.2d 960 (2d Cir. 1963).

However, this law is inapplicable to the ECMC Defendants. Britt's claims rest entirely on her belief that Baity was "involuntarily committed," but the evidence is devoid of facts that could substantiate this argument. Notably, in both her memorandum of law and her Local Rule 56 (a)(1) statement of facts, Britt fails to include any citation to the record that indicates Britt or Baity objected to her stay at ECMC.

Although there is no dispute that Baity was initially picked up pursuant to NYMHL 9.45, she was not admitted to or treated at ECMC under the law. Dr. Peter Stastny, Britt's own expert, admits as much. (Stastny Deposition, p. 41.) Further, NYMHL § 1.03(10) defines a hospital, as used in § 9.45, as "in-patent services of a psychiatric center." Britt, however, was admitted to "Medicine C Services", a medical, not a psychiatric floor. (ECMC Medical Record, Exhibit 2.) She was admitted with medical diagnoses, such as hypertension and atrial fibrillation and there is nothing in the record that suggests her treatment was involuntary. Therefore, none of the NYMHL § 9.45 procedural protections

---

federal courts should, where possible, avoid reaching constitutional questions.") This Court finds that Baity's rights were not violated and therefore the relevant analysis applies to each of three doctors equally. Therefore, this Court will treat them collectively as the "ECMC Defendants."

were triggered. In this respect, the due process safeguards associated with the law may have been violated by Crisis Services or Giwa, but they were not violated by the ECMC defendants who simply treated Baity like any other patient.

Britt's argument that Baity's substantive due process rights, including a "right of privacy to be left alone," is also grounded in her belief that Baity was "civilly committed." Due process does not permit the involuntary hospitalization of a person who is not a danger to herself or others. See Rodriguez v. City of New York, 72 F.3d 1051 (2d Cir. 1995). But, as explained above, Baity was not committed involuntarily as a psychiatric patient. There is no indication in the record that the ECMC defendants restrained Baity or forced her to remain in the hospital. Baity never objected to the physical or mental examinations that she underwent. Nor did she state that she was unwilling to take medications. (Baity Deposition, pp. 111-112, 120; Docket No. 312-2, Exhibit F.) Once again, Britt's own expert, Kenneth Condrell, Ph.D, testified that he saw nothing in the ECMC record which indicated that Baity was treated or admitted against her will. (Condrell Deposition, p. 104.) The records also indicate that Mattie Britt was aware and approved of Baity's treatment at ECMC and her discharge to Grace Manor.

Accordingly, Baity's due process rights were not violated because her treatment was not involuntary and she was not deprived of a liberty interest.

Britt's remaining federal causes of action against Drs. Rados, Ligot, and Blume are equally without merit.[11] The facts recited above preclude Britt's false arrest claim as there

---

[11] Britt does not even argue these claims in her memorandum of law.

is no evidence that the ECMC defendants intended to confine Baity without her consent.[12]

Britt also seeks to hold the ECMC defendants liable for failing to commence guardianship proceedings under New York Mental Hygiene Law Article 81. This is a discretionary action permitted by the laws of New York – failure to invoke it does not implicate constitutional or federal rights. Consequently, summary judgment is warranted on this cause of action.[13]

Finally, Britt asserts a medical malpractice claim against the ECMC defendants. The Second Circuit has stated, however, that "a doctor will not be liable under § 1983 for the treatment decisions she makes unless such decisions are 'such a substantial departure from accepted judgment, practice, or standards as to demonstrate that [she] actually did not base the decision on such a judgment.'" Kulak v. City of New York, 88 F.3d 63, 75 (2d Cir.1996) (quoting Youngberg v. Romeo, 457 U.S. 307, 323, 102 S. Ct. 2452, 73 L. Ed. 2d 28 (1982). This standard requires more than simple negligence on the part of the doctor but less than deliberate indifference. Id.

Britt relies on Rodriguez, 72 F.3d 1051, for her contention that the ECMC defendants are liable under a malpractice theory. In Rodriguez, a plaintiff brought an action under § 1983 claiming that her involuntary commitment to a mental institution violated the mandatory requirements of New York Mental Hygiene Law § 9.45. The Second Circuit decided that an expert affidavit asserting that the treating physicians made incorrect and objectively unreasonable decisions created an issue of fact for trial. However, Plaintiff's

---

[12] A § 1983 claim for false arrest requires proof that: (1) the defendant intended to confine the plaintiff; (2) the plaintiff was conscious of the confinement; (3) the plaintiff did not consent to confinement; and (4) the confinement was not otherwise privileged. Posr v. Doherty, 944 F.2d 91, 96 (2d Cir.1991).

[13] This applies with equal force to the Housing Authority defendants.

expert, Dr. Peter Stastny, the same expert in Rodriguez, basis his conclusions that the ECMC defendants departed from acceptable standards of care on the assumption that Baity was held involuntarily. (Stastny Affidavit, ¶¶ 25-29.) Unlike his report in Rodriguez, Dr. Stastny makes no assertions that any of the actual treatment that Baity received was inappropriate. Because it has already been determined that Baity was not held involuntarily, Dr. Stastny's conclusions, which are factual and legal in nature, do not raise any triable issue of fact that would subject the ECMC defendants to § 1983 liability.[14] Accordingly, summary judgment is warranted for the ECMC defendants on this claim.

### 3. The Housing Authority Defendants

#### a. Baity's Removal from her Residence

The great majority of Britt's allegations are aimed at Giwa, who is now a non-party in this case. After all, Giwa initially called Crisis Services and started in motion the chain of events that are the basis of this litigation. Britt also alleges that it was Giwa who grabbed Baity's arm and forced her into "confinement." Britt seeks to hold Garbe and the Housing Authority liable for these actions. However, for the following reasons, Britt's claims lack merit.

Personal involvement in the deprivation of federal constitutional rights is the *sine qua non* of liability under § 1983. See Haygood v. City of New York, 64 F.Supp.2d 275, 280 (S.D.N.Y.1999). It is well settled in this Circuit that personal involvement by defendants in

---

[14] For this reason, the ECMC defendants are also entitled to qualified immunity. Their actions in treating an impaired elderly woman in the face of conflicting wishes from different members of her family were objectively reasonable. See Warren v. Keane, 196 F.3d 330, 332 (2d Cir.1999) (finding that officials are protected from § 1983 liability on the basis of qualified immunity if (1) their actions did not violate clearly established law, or (2) it was objectively reasonable for them to believe that their actions did not violate the law).

cases alleging constitutional deprivations is a prerequisite to an award of damages under § 1983. See McKinnon v. Patterson, 568 F.2d 930, 934 (2d Cir.1977); Richardson v. Coughlin, 101 F.Supp. 2d 127, 129 (W.D.N.Y. 2000) The Second Circuit construes personal involvement in this context to mean "direct participation, or failure to remedy the alleged wrong after learning of it, or creation of a policy or custom under which unconstitutional practices occurred, or gross negligence in managing subordinates." Black v. Coughlin, 76 F.3d 72, 74 (2d Cir.1996); see also Wright v. Smith, 21 F.3d 496, 501 (2d Cir.1994).

Britt points to no custom or policy of the Housing Authority that caused the alleged constitutional violations. Nor could any reasonable jury conclude that the Housing Authority or Garbe, as a Housing Authority supervisor, were grossly negligent in the management of subordinates, as the record is evident that Garbe played no role in Baity's transfer to ECMC. (See Garbe Deposition, pp. 19-21.) In fact, Britt admits that Garbe never directed Giwa to call Crisis Services. (See Pl.'s Statement, ¶ 5.)

Further, it is undisputed that, Jill Stadelmeyer, a Crisis Services employee, conducted an independent evaluation in which she alone determined that Baity should be taken to ECMC pursuant to MHL § 9.45. Britt's own statement of facts admits as much: "The Crisis Team determined that nine forty-five criteria [were] met and summoned [Housing Authority] police officers to Ms. Baity's apartment and Ms. Baity was involuntarily transported to [ECMC]. (Pl.'s Statement, ¶ 2 (IV).) Britt fails to raise any triable issue of fact that Garbe or the Housing Authority were personally involved in this decision. Accordingly, summary judgment is granted for the Housing Authority defendants on all claims arising out of Baity's removal from her residence. See Black, 76 F.3d at 74.

      b*.*      <u>Eviction Proceedings</u>

Britt also brings several claims arising out of the eviction proceedings which Garbe and the Housing Authority commenced in Baity's absence.

First, Britt asserts a malicious prosecution claim. To establish a claim for malicious prosecution under New York law, the plaintiff must show: (1) that the defendant initiated a criminal prosecution against the plaintiff; (2) that the defendant lacked probable cause to believe the proceeding could succeed; (3) that the defendant acted with malice; and (4) that the prosecution was terminated in the plaintiff's favor. <u>Ricciuti v. N.Y.C. Transit Auth.</u>, 124 F.3d 123, 130 (2d Cir.1997).

Britt fails to raise a triable issue of fact with at least three of these elements: (1) Britt's claim for malicious prosecution arises out of civil eviction proceedings, not a criminal prosecution; (2) the eviction was commenced because Baity was undisputedly behind in her rent, making it likely that the Housing Authority would succeed; and (3) the proceeding ended in a settlement, which is not a termination in favor of the plaintiff for purposes of a malicious prosecution claim. <u>See</u> <u>Murphy v. Lynn</u>, 118 F.3d 938, 949 (2d Cir.1997). Summary judgment is therefore appropriate on this claim.

Second, Britt alleges an abuse of process claim in conjunction with the eviction proceedings. "A malicious abuse-of-process claim lies against a defendant who (1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse of justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." <u>Savino v. City of New York</u>, 331 F.3d 63, 76 (2d Cir. 2003) (citing <u>Cook v. Sheldon</u>, 41 F.3d 73, 80 (2d Cir.1994)).

Here, Garbe was justified in commencing eviction proceedings since it is undisputed

17

that Baity was behind in her rent. Further, the pursuit of that rent was a legitimate end. Therefore, this cause of action is without merit, warranting summary judgment.

Britt's third and final claim arising out of the eviction proceedings alleges that Garbe deprived Baity of property without procedural due process. Britt argues that Garbe and the Housing Authority should have personally served Baity with notice of the eviction, instead of posting it on her door. However, Baity ultimately became aware of the proceedings, and her attorney appeared in court and negotiated a settlement in which it was agreed that Baity would not be evicted. Because Baity was not deprived of any property, this cause of action lacks an essential element and must be dismissed. Cf. Greene v. Lindsey, 456 U.S. 444, 456, 102 S.Ct. 1874, 72 L.Ed.2d 249 (1982) (finding that, where plaintiffs were *deprived of property*, the defendants were liable for inadequate eviction notices, which violated the Due Process Clause.)

**C.     Remaining State Claims**

Having disposed of all federal claims falling within this Court's original jurisdiction, this Court finds it appropriate to decline to exercise supplemental jurisdiction over Britt's claims regarding violations of New York State law. See 28 U.S.C. § 1367(c)(3). The United States Supreme Court has instructed that courts should ordinarily decline to exercise supplemental jurisdiction in the absence of federal claims. See Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988) (noting that in the usual case where all federal claims are eliminated before trial, the relevant factors informing the decision of whether to exercise supplemental jurisdiction will "point towards declining to exercise jurisdiction over the remaining state-law claims"); United Mine

Workers of Am. v. Gibbs, 383 U.S. 715, 726, 86 S. Ct. 1130, 16 L. Ed. 2d 218 (1966) ("Certainly, if the federal claims are dismissed before trial, . . . the state claims should be dismissed as well.").

The Second Circuit shares this view: where "federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine – judicial economy, convenience, fairness, and comity – will point toward declining to exercise jurisdiction over the remaining state-law claims." Valencia ex rel. Franco v. Lee, 316 F.3d 299, 305 (2d Cir. 2003); see also Marcus v. AT&T Corp., 138 F.3d 46, 57 (2d Cir. 1998) ("In general, where the federal claims are dismissed before trial the state claims should be dismissed as well.)

Accordingly, this Court declines to exercise supplemental jurisdiction over Britt's state law claims. Instead, this Court dismisses them without prejudice pursuant to 28 U.S.C. § 1367(c)(3).

## IV. CONCLUSION

For the foregoing reasons, each Defendants' motion for summary judgment is granted and Britt's motion for summary judgment is denied.

## V. ORDERS

IT HEREBY IS ORDERED, Dr. Phillip Rados' Motion for Summary Judgment (Docket No. 301) is GRANTED.

FURTHER, David J. Gentner's, Grace Manor Health Care Facility's, Tiffany

Case 1:06-cv-00057-WMS-HKS   Document 352   Filed 10/27/11   Page 20 of 20

Matthews', Kathy Randall, and Mary Stephan's Motion for Summary Judgment (Docket No. 304) is GRANTED.

FURTHER, Buffalo Municipal Housing Authority's and Elaine Garbe's Motion for Summary Judgment (Docket No. 305) is GRANTED.

FURTHER, Drs. Teresa Chau's and Nelda Lawler's Motion for Summary Judgment (Docket No. 306) is GRANTED.

FURTHER, Dr. Jessica Blume's, Dr. Jesus Ligot's, Erie County's and Erie County Medical Center's Motion for Summary Judgment (Docket No. 307) is GRANTED

FURTHER, Carmen Britt's Motion for Summary Judgment (Docket No. 308) is DENIED.

FURTHER, this Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims, which are hereby DISMISSED pursuant to 28 U.S.C. § 1367(c)(3) without prejudice.

FURTHER, the Clerk of the Court is directed to close this case.

SO ORDERED.

Dated: October 23, 2011
Buffalo, New York

/s/William M. Skretny
WILLIAM M. SKRETNY
Chief Judge
United States District Court

20